## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>PETROHUNTER ENERGY CORPORATION,<br><br>Debtor. | Case No. 16-20197 KHT<br>Chapter 7 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a two-day trial commencing April 18, 2019 on the Chapter 7 Trustee's Motion to Sell the estate's interest in stock of Sweetpea Petroleum Pty, Ltd., an Australian company free and clear of liens ("Sale Motion," Docket #293), and the Objection filed by Marc A. Bruner, in his individual capacity and as an assignee of David E. Brody; MAB Resources, LLC; Bruner Family Trust; Bruner Family Trust II; Carmen Lotito; Laura M. Lotito; and BioFibre Technology International, Inc. (collectively, the "Objectors") (Docket #298).

The Court has considered the evidence presented at trial and the arguments of the parties, and in accordance with Fed.R.Civ.P. 52, Fed.R.Bankr.P. 7052 and 9014, the Court hereby issues the following findings and conclusions:

**I. FINDINGS**

**A. JURISDICTION AND VENUE**

This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 157(b)(2) and 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**B. PARTIES**

**1. Debtor and its Bankruptcy Filing**

PetroHunter Energy Corporation ("Debtor") filed its voluntary petition under Chapter 7 of the Bankruptcy Code with this Court on October 17, 2016 (the "Petition Date"). Jeffrey Hill was appointed and is the acting Chapter 7 trustee ("Trustee") of the bankruptcy estate. Trustee is an experienced Chapter 7 panel

trustee, with over 31 years of experience in administering thousands of bankruptcy estates and selling estate assets.

In this case, Debtor's chief asset is 100% of the stock of Sweetpea Petroleum Pty, Ltd., an Australian entity ("Sweetpea").

### 2. Sweetpea

Sweetpea holds the following assets:

(i) approximately 58 million shares of the outstanding shares of Falcon Oil and Gas, Ltd., a Canadian company, publicly traded on the Toronto Stock Exchange (the "Falcon Stock");

(ii) approximately $6 million[1] in cash deposits, investment and brokerage accounts (collectively, the "Accounts"); and

(iii) oil and gas development interests in the Beetaloo Basin, Northern Territory of Australia.

Sweetpea's oil and gas development assets consist of a 50% ownership interest in two exploration permits, EP 136 and EP 143 (the "Permits")[2] for oil and gas development in the Beetaloo Basin, subject to a joint venture with Paltar Petroleum Limited, an Australian company ("Paltar"). Pursuant to Sweetpea and Paltar's Joint Venture and Operating Agreement ("JVOA"), Paltar is the operator. In addition, Sweetpea owns a 100% interest in an application for an exploration permit (EPA 197) for oil and gas development, also in the Beetaloo Basin. Sweetpea's interests in the Permits and in EPA 197 shall be referred to hereafter as the "Beetaloo Assets."

The Permits are presently undeveloped; no wells have been drilled on any of the Permits held by the joint venture. Moreover, there has been no production in the Beetaloo Basin; it is an area in the early stages of exploration. However, the Beetaloo Basin has significant prospects for oil and gas production.

Trustee's appraiser, Edwin Moritz of Gustavson and Associates, testified at trial as an expert in the valuation of oil and gas assets. Mr. Moritz issued an appraisal of the Beetaloo Assets in January 2018 and his updated appraisal in September 2018, valuing Sweetpea's interest at between $975,000 and $1.64 million. He arrived at these figures using the comparable sales approach based

---

[1] All dollar amounts are in U.S. Dollars unless otherwise noted.
[2] Permits are equivalent to oil and gas leases in the United States.

upon eight sales in the area spanning April 2011 to October 2017, with the majority of sales in 2014 or later. Mr. Moritz used comparable properties in his valuation, both inside and outside of the mapped "unconventional fairway," since the Beetaloo Assets also contain areas that are both inside and outside of the fairway.

The Objectors' valuation expert, Michael Kanis, indicated Trustee's value was overly generous. Mr. Kanis testified the northern portion of EP 136 alone would be worth up to $667 million *if developed*, assuming the necessary seismic data were obtained, the requisite infrastructure were in place, and assuming wells were drilled and producing on the Permits. But when asked about the value of the Beetaloo Assets "as is" as of the date of the trial, he testified they have no value.

### 3. Purchaser TS Capital

TS Capital Partners, LLC ("TS Capital") is a private investment company owned equally by Robert Telles and David Siegel. TS Capital is not an "insider" of Debtor, as that term is defined in Section 101(31)[3] of the Bankruptcy Code; TS Capital and its two principals have none of the enumerated relationships or connections with Debtor. TS Capital and its principals are not officers, directors, or persons in control of the Debtor, partnerships in which Debtor is a general partner, general partners of Debtor, or relatives of any of the foregoing. TS Capital, however, does have relationships and entanglements with entities related to Objector Marc A. Bruner, including an approximate 4% investment in Paltar, and is involved in litigation with Bruner-controlled entities.

### 4. Objectors

Objectors include Mr. Bruner, who has been the Chairman and Chief Executive Officer of Paltar, the operator under the JVOA, since its inception. Mr. Bruner owns about a third of Paltar through another of his companies. Mr. Bruner also owns or controls Objector MAB Resources, LLC ("MAB"), which acquired Sweetpea in 2005 and later contributed assets, including Sweetpea, to form Debtor in 2007.

Mr. Bruner is the Chairman, Chief Executive Officer and largest shareholder of Fortem Resources, Inc. ("Fortem"), a public entity traded on the TSX Venture Exchange. Fortem submitted two offers to Trustee for the Sweetpea stock shortly before the commencement of the trial, and the parties referred to two additional offers submitted previously by Bruner-related entities.

---

[3] All references to the Bankruptcy Code or to Sections thereof are to 11 U.S.C. § 101 *et seq.*

### C. Marketing Efforts

Trustee hired experienced professionals to assist him with marketing Sweetpea's Beetaloo Assets.[4] Matthew Silverman, a certified petroleum geologist who originally served on the Board of Directors of Debtor at the request of Mr. Bruner, and later on the Board of Sweetpea at the request of Trustee, has a long history with the Beetaloo Basin, and the specific Beetaloo Assets. He studied the geology of the area and investigated its development potential. Mr. Silverman assisted Trustee in selecting an appraiser, finding marketing professionals, and putting together marketing information as well as populating the virtual data room ("VDR") with technical, commercial and legal documents. Mr. Silverman testified he put into the VDR all of the documents he could get his hands on. Included in the VDR was a complete copy of the JVOA, as well as information regarding the ongoing disputes between Sweetpea and Palter.

Mr. Silverman and David Bickerstaff, a geologist with extensive experience in mergers and acquisitions of upstream oil and gas assets, put together a list of marketing companies, three of whom made proposals. In early September 2018, under Trustee's direction, Sweetpea engaged Ocean Reach Advisors ("Ocean Reach"), a private firm with an Australian financial services license, to market the Beetaloo Assets. Ocean Reach is located in Perth, Australia.

Austen Fresson is the Chief Executive Officer of Ocean Reach. Mr. Fresson testified as an expert in the field of marketing oil and gas interests. Over the last twenty years, Mr. Fresson has been involved in the marketing and sale, divestment, or farmout of upstream oil and gas assets around the globe. He testified Ocean Reach obtained data concerning the Beetaloo Assets, formulated a marketing plan, prepared an information memorandum and a marketing flyer for distribution. Ocean Reach also managed the marketing process through the due diligence phase and ultimately, up to the receipt of any offers.

Ocean Reach specifically targeted approximately 90 companies to whom it actively marketed the assets and distributed the flyer. The 90 parties Ocean Reach identified for its campaign consisted of companies involved in exploration in the Beetaloo Basin as well as other companies with operations in Australia. Ocean Reach, however, did not target any Bruner-controlled entities. Ocean Reach also identified companies that had experience in unconventional resources, primarily in North and South America.

Meagher Energy Advisors, also retained by Sweetpea at Trustee's direction, utilized its database of over 15,000 potential purchasers to whom it distributed the

---

[4] Initally, Trustee sought to sell the Beetaloo Assets held by Sweetpea rather than its stock.

4

flyer prepared by Ocean Reach and published the flyer in trade journals. In addition, Mr. Fresson testified third parties obtained and republished the flyer, resulting in a wide, international campaign to solicit interest for the Beetaloo Assets.

### D. Marketing Results

Of the thousands of contacts to whom the Beetaloo Assets were solicited, ten to twelve executed confidentiality (non-disclosure) agreements, two of whom were key players in the Beetaloo Basin. Unfortunately, in the end, none made offers for the assets.

Mr. Fresson credibly testified as to several factors that, in his opinion, deterred prospective purchasers and made marketing the Beetaloo Assets difficult: (1) the Beetaloo Assets are non-operated interests, so the owner is heavily reliant upon the operator of the joint venture (Paltar); (2) Paltar's credentials and financial capability were unclear; (3) the permits held by the joint venture are "late life," as there are only two of the five years remaining on the terms of each, and there are onerous commitments – to acquire seismic data and drill two wells in each permit area – that must be accomplished within a short timeframe. To obtain seismic data, the deadline on the permits is in August 2019. Any purchaser would need to pay 50% of the cost of those milestones and there was no information on the operator's plans to meet them in order to satisfy the permits granted by the Australian government; and (4) litigation of the ongoing disputes between the operator (Paltar) and the non-operator (Sweetpea).

Mr. Fresson further testified in his experience, an aspect of the JVOA is highly unusual. Although a permit is for a contiguous rectangular area, the JVOA applied a mechanism for subdividing the permits into a checkboard pattern of 50/50 ownership once drilling had occurred. Prospective purchasers had a lot of questions as to why that mechanism was put in place, and it was a key concern. The biggest obstacle, however, was the Paltar litigation: both its timeframe (while the Permits are marching on to expiration), and its substance (involving Sweetpea's alleged default under the Called Sum Notices, which presents the possibility of losing title to the assets).

Elan Sasson, an Australian lawyer in the global law firm of Quinn Emanuel, described the Paltar litigation in greater detail. Although Trustee originally hired the Quinn Emanuel firm in December 2016 to perform regulatory and corporate legal services for Sweetpea, the scope of the firm's engagement was broadened after Paltar issued two "Called Sum Notices" to Sweetpea on January 30, 2017, totaling AUD $69,735,604 and AUD $90,367.81 respectively.

Mr. Sasson reviewed the Called Sum Notices and determined the amounts claimed thereunder were not due; further, he believed conditions precedent to their issuance, under the terms of the JVOA, had not been satisfied. Accordingly, Sweetpea commenced a lawsuit in New South Wales, Australia against Paltar contesting the validity of the Called Sum Notices and claiming Paltar issued them in bad faith. That litigation remains pending.

A Called Sum is defined in the JVOA as "an amount to be contributed by a Participant in respect of Work Program Expenses or other payments required by this Agreement." JVOA Section 1.1, Exhibit 4, p.10. "Work Program Expenses means *the costs and expenses incurred, paid or payable by the Operator in accordance with the provisions of this Agreement or otherwise authorised by the Management Committee in connection with conducting the Work Program* during the Work Period, but does not include the Initial Work Program Expenses." JVOA, Section 1.1, Exhibit 4, p.18 (emphasis added).

In excerpts from Mr. Bruner's videotaped deposition presented at trial, Mr. Bruner confirmed there was no management committee. Further, based upon Mr. Bruner's videotaped testimony, it appears Mr. Bruner caused Called Sum Notices to be issued by Paltar to Sweetpea without the underlying expenses having been incurred. While some work was performed and some expenses were incurred with respect to the Permits, the majority of the work has not yet been performed. In the several years since the Permits were originally issued, no seismic data has been acquired, and no wells have been drilled. Much of what has been done with respect to the Permits consists of a number of requests for extensions made by Paltar to the Northern Territory. According to Mr. Bruner, Paltar issued Called Sum Notices to Sweetpea based upon quotes or proposals provided by contractors for work that was not – and still has not – been performed or invoiced.

### E. Proposed Sale Terms and Competing Offers

While the Beetaloo Assets were being marketed by Ocean Reach and others, Trustee was involved in negotiations to sell the assets to TS Capital. The negotiations between Trustee on behalf of Sweetpea and TS Capital were conducted at arms-length, over the course of over eighteen months. Robert Telles, a 50% owner of TS Capital, is a lawyer. Mr. Telles conducted the negotiations for TS Capital up until they received the first draft of the Purchase and Sale Agreement ("PSA") with Trustee, at which time TS Capital retained counsel.

Pursuant to the PSA, TS Capital provided $50,000 in earnest money to Trustee. TS Capital paid an additional $450,000 to Trustee, held in his counsel's trust account, for a total of $500,000 in cash paid by TS Capital. TS Capital will

provide the following additional consideration for the Sweetpea shares, pursuant to the terms of the PSA:

(a) the "Agreed Value" of the Falcon Stock, which is an average of the closing price of this publicly traded stock on the TSX Venture Exchange for the 20 consecutive trading days ending on the trading day that is five days prior to the closing date, or earlier if five days is not a trading day;

(b) the value of the Accounts; and

(c) a 2% overriding royalty interest ("ORRI") in the Beetaloo Assets to the estate after the sale, which will entitle the estate to 2% of $8/8^{th}$ of all hydrocarbons produced on lands subject to the Beetaloo Assets. The PSA provides options for TS Capital to re-purchase portions of the ORRI from the bankruptcy estate under the circumstances enumerated in Article IV.

Payment of the Agreed Value for the Falcon Stock and the value of the Accounts may be satisfied at closing by TS Capital delivering to Trustee the Falcon Stock and the delivery of the cash, cash equivalents and other investments held by Sweetpea in its Accounts to Trustee in kind.

Trustee's proposed sale to TS Capital does not entail any transfer of the Beetaloo Assets; these shall remain with Sweetpea. Accordingly, the sale to TS Capital is subject to the JVOA and all litigation of Sweetpea's position as against Paltar, including any joint venture cross charge issues raised by Objectors at trial. This is significant in part because the anticipated litigation costs are in excess of $250,000. Moreover, TS Capital agrees to indemnify the estate as to all claims asserted against Sweetpea.

Section 11.02(b)(i) of the PSA contains bid protections for TS Capital in the form of a breakup fee of $250,000 plus expenses, in the event the price paid by a third party for the assets exceeds $1.5 million.

The last offer made by Fortem just before trial was in accordance with the same terms of the PSA, except $100,000 more consideration in cash (for a total of $600,000), $10,000 more in earnest money ($60,000), an increased ORRI to be provided to the estate from 2% to 5%, and a release to be provided.

Trustee was aware of the offers made by Bruner-controlled entities but he rejected those offers, not due to any animus against Mr. Bruner, but due to Trustee's lack of confidence in Mr. Bruner's and his entities' ability to close any deal containing promises of future performance. Trustee views the Called Sum

Notices as a fraud upon Sweetpea, and that is his rationale for refusing to accept offers from any Bruner-controlled entity; he does not have the confidence they can perform.

Trustee testified he regarded TS Capital's offer as the best potential outcome for the sale of the Sweetpea stock, and really the only viable offer despite Trustee's extensive efforts to market the assets. Given the time constraints imposed in the Permits, Trustee testified it is important to close the sale before it evaporates. Finally, Trustee confirmed TS Capital is not an insider, and he believes the negotiations were made in good faith.

Mr. Telles also testified TS Capital was ready, willing and able to close. In fact, TS Capital has already tendered the $500,000.

### F. Motion to Sell and Objection

Trustee filed the Sale Motion on January 15, 2019. Notice and Amended Notice of the Sale Motion were served upon all interested parties and creditors. No party, other than Objectors, responded to the Sale Motion.

Objectors contend notice of Trustee's Sale Motion was materially defective because Trustee represented the value of Sweetpea's stock as "equivalent to the net value" of its underlying assets, but did not define "net value"; Trustee's representation that the value of the sale is approximately $20 million is materially misleading since the only "risk capital" required to be expended by TS Capital is $500,000; TS Capital could manipulate the value of the Falcon stock by shorting it; the PSA does not state when the Accounts are to be valued and they could be substantially worth less as of the closing date "if used to pay Sweetpea's substantial tax obligations"; the bid protections proposed in Section 11.02(b)(i) of the PSA are material and should have been disclosed; Trustee did not disclose the mineral acreage involved in the Permits; and Trustee failed to notify compliance with the JVOA is required to grant the ORRI.

Objectors also contend the Sale Motion itself is materially defective because it does not comply with technical requirements of Local Bankruptcy Rule 6004-1(e)(1) and (2) by stating the basis under Section 363(f) and listing the liens Trustee seeks to sell free and clear of and their amounts, as well as Local Bankruptcy Rule 6004-1(d)(N) (Sale Motion does not highlight Trustee seeks the 14 day stay waived). Objectors assert the Sale Motion contains materially misleading statements and omissions; fails to inform of TS Capital's repurchase options at Sections 4.02(a) and (b) of the PSA and other alleged omissions. Objectors also dispute the Gustavson valuation. Objectors lament Trustee's failure

to disclose the other offers made by Bruner-related entities, so the inference in the Motion that the stock was fairly marketed is materially misleading.

Objectors also assert the PSA is materially defective because the purchase price is unclear since it is silent as to when the Accounts are to be valued; the PSA schedules are not attached; the Seller's representations and warranties are not accurate because, for example, the PSA omits a 4% ORRI held by MAB Resources, LLC; Purchaser provides no financial information from which one could value the Purchaser's representations and warranties in the PSA; and bid protections were not approved by the Court in advance.

Finally, Objectors argue the proposed sale is not in the best interest of the estate because the Trustee froze out Bruner *et al.* out of the bidding and spurned a competitive bidding process.

## II. CONCLUSIONS

### A. Trustee Exercised Reasonable Business Judgment

Chapter 7 trustees are charged with the duty of liquidating estate property expeditiously. 11 U.S.C. § 704(a)(1). Under Section 363(b), a trustee may sell property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b). A trustee may sell estate property either by public auction, or by private sale. Fed.R.Bankr.P. 6004(f)(1); *see also, In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (trustee has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property") (quoting *In re WPRV-TV, Inc.*, 142 B.R. 315, 319 (D.P.R. 1991)).

When a party objects, the trustee's burden is to show he or she exercised sound business judgment in connection with the proposed sale. *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

> The appropriate standard used by courts in reviewing a trustee's recommendation has been enunciated in myriad ways. *See, e.g., In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991) (stating that sales are an exercise of a fiduciary duty that requires an "articulated business justification"); *In re Chung King, Inc.,* 753 F.2d 547, 549 (7th Cir. 1985) (opining that the sale must result in the estate obtaining the best price possible under the circumstances); *In re Apex Oil Co.,* 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988) (holding that a sale must be both "fair and reasonable" in price and made in "good faith"); *In re Phoenix Steel Corp.,* 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (holding that the transaction must be "fair and equitable" and in "good faith"); *In re*

9

>	*Charlesbank Laundry Co.,* 37 B.R. 20, 22 (Bankr. D. Mass. 1983) (stating that the sale must be "in the best interests of the estate and creditors"). These variations all fall under the rubric of the "business judgment" test. *See* 3 Collier on Bankruptcy § 363.02[1][g], at 363–14 (Lawrence P. King, ed., 15th ed. rev. 1997).

*In re Psychrometric Sys., Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (*citing In re Bakalis,* 220 B.R. 525, 531–32 (Bankr. E.D.N.Y. 1998)).

The Court's job is not to substitute its own judgment for that of the trustee, since "[t]he trustee's business judgment is to be given 'great judicial deference.'" *Id.* Under the "business judgment rule," the factors the Court should consider in determining whether to approve a proposed sale include:

>	a) Any improper or bad motive;

>	b) The price is fair and the negotiations or bidding occurred at arm's length; and

>	c) Adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.

*In re Castre, Inc.*, 312 B.R. at 428.

The Court finds the negotiations between Trustee and TS Capital occurred at arms-length. Further, the Court finds there is no improper or bad motive on the part of either Trustee or the proposed purchaser, TS Capital, with respect to the sale of the Sweetpea stock. While TS Capital may have entanglements with Mr. Bruner or his entities, TS Capital is not an "insider" under the Bankruptcy Code, and there was no evidence presented of any improper or bad motivation.

The Court further finds the purchase price under the PSA is fair and reasonable. While the trustee has a duty to maximize return for the estate[5], the "'highest' bid is not always the 'highest and best' bid. The inclusion of 'best' in that conjunction is not mere surplusage." *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998). *See also, e.g., G-K Development Co., Inc. v. Broadmoor Place Investments, L.P. (In re Broadmoor Place Investments, L.P.)*, 994 F.2d 744 (10th Cir. 1993). The Court concludes Trustee's decision to go forward with the PSA despite Fortem's eleventh hour offers was a reasonable exercise of his business judgment. Although Fortem's offer was for a higher dollar amount, no earnest money was tendered. "A bankruptcy trustee is a conservator of the estate and

---

[5] *See, e.g., In re Bakalis*, 220 B.R. at 531-32.

must, to the extent possible, be risk averse." *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998). In *Bakalis*, the bankruptcy court upheld trustee's decision to decline higher dollar offer associated with "a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset." *Id.*

The Court also concludes adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest, were put into place by Trustee in connection with the proposed sale. Trustee sought out competent professionals to assist with evaluating and marketing the assets at issue, and the marketing efforts undertaken by those professionals were extensive and global in nature. Even though Trustee was negotiating for over a year and a half with TS Capital, he made sure to expose the assets to a wide audience.

The Federal Rules of Bankruptcy Procedure require "the terms and conditions of any private sale and the time fixed for filing objections" be included in any notice of the proposed sale, and notice "is generally sufficient if it describes the property." Fed.R.Bankr.P. 2002(c)(1). The Court finds Trustee's notice of the sale complied with these requirements, notwithstanding Objectors' concerns about the sale notice; Trustee's Notice and Amended Notice of the Sale Motion provided a sufficient description of the terms and conditions of the proposed sale to TS Capital and description of the property to be sold. Since the PSA was attached in full to the Sale Motion, interested parties had a full and fair opportunity to review the terms and accordingly, the Court finds Objectors' issues with the alleged insufficient information provided in the Sale Motion are invalid.

The Court also finds the notice complied with the requirements of Fed.R.Bankr.P. 6004, and Local Bankruptcy Rule 6004-1(e)(1) and (2). Trustee included information that the sale of the Sweetpea stock is to be free and clear of liens pursuant to Section 363(f), and that certain parties have asserted lien in the Sweetpea stock. Trustee notified interested parties and creditors he had commenced an adversary proceeding in this Court, *Jeffrey L. Hill, Chapter 7 Trustee v. JTE Finanz AG, et al.*, Adv. Proc. No. 17-1337, to avoid the various liens asserted against the stock by the parties identified in the Sale Motion because the stock is certificated and Trustee holds the certificates. Trustee further disclosed he "anticipates the value of the stock sale to be approximately $20 million with valid liens and/or encumbrances totaling approximately $1 million." Sale Motion at ¶13.

The proposed bid protections Section 11.02(b)(i) of the PSA were not approved by the Court prior to the sale and Trustee has not conducted an auction of the Sweetpea stock with competing bids. Section 11.02(b)(i) of the PSA is therefore moot.

### B. TS Capital Is a Good Faith Purchaser

"Good faith purchaser" is not defined in the Bankruptcy Code. Therefore, traditional principles govern the "good faith" analysis; "a 'good faith purchaser' is one who buys in 'good faith' and 'for value.'" *Tompkins v. Frey (In re Bel Air Associates, Ltd.)*, 706 F.2d 301, 305 (10th Cir. 1983) (examining good faith purchaser under Fed.R.Bankr.P. 805, the predecessor to Section 363(m)) (citing *Greylock Glen Corp. v. Community Saving Bank*, 656 F.2d 1, 4 (1st Cir. 1981); *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).

A purchaser's good faith is measured "by the integrity of his conduct *during the course of the sale proceedings. . .*" *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (quoting *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2nd Cir. 1997) (emphasis added)). The type of conduct that ordinarily demonstrates a lack of good faith in the asset sale context "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Tompkins v. Frey (In re Bel Air Associates, Ltd.)*, 706 F.2d 301, 305 n.11 (10th Cir. 1983) (citing *In re Rock Indus. Machinery Corp.*, 572 F.2d at 1198).

In assessing the good faith of a purchaser, courts consider factors such as: 1) whether the sale was negotiated at arm's length; 2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and 3) whether fraud or collusion exists among the prospective purchaser, any other bidders, or the trustee. *In re Buerge*, No. BAP KS-12-074, 2014 WL 1309694, at *13 (B.A.P. 10th Cir. Apr. 2, 2014) (unpublished opinion), *citing In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir.1986).

The Court finds TS Capital is a good faith purchaser under Section 363(m). The negotiations between Trustee and TS Capital occurred at arms-length and in good faith; there is no improper or bad motive on the part of either Trustee or the proposed purchaser, TS Capital, with respect to the proposed sale; TS Capital is not an "insider" under the Bankruptcy Code; and TS Capital is providing reasonable value for the assets. The Court further finds the litigation between TS Capital and/or its principals and Bruner-related entities and/or Bruner does not provide a factual basis for a bad faith finding on the part of TS Capital and Trustee.

The Tenth Circuit has previously held an additional requirement for good faith status under Section 363(m) is that the purchaser pay "at least 75% of the appraised value of the assets.'" *Crowder v. Given (In re Crowder)*, 314 B.R. 445, 450 (10th Cir. BAP 2004) (quoting *Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 n.11-12 (10th Cir. 1983) (interpreting Fed.R.Bankr.P. 805, predecessor to § 363(m)). To the extent this 75% rule even applies to the modern-day Section 363(m) (*cf.*

*Crowder*), the Court finds it is easily met here in light of the overall consideration to be paid for the Sweetpea stock.

### C. Requirements of Section 363(f) Are Satisfied

Section 363(f) provides "the trustee may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of sch interest.

"Because those conditions are listed in the disjunctive, satisfying any one of them is all that is necessary for the trustee . . . to sell free and clear, so long as the other elements of § 363 are met." *In re WK Lang Holdings, LLC*, 2013 WL 6579172, at *8 (Bankr. D. Kan. Dec. 11, 2013) (slip copy).

The Court finds at a minimum, Section 363(f)(3) and (4) apply to the proposed sale of Sweetpea stock and are satisfied. The consideration to be paid by TS Capital (estimated by Trustee at approximately $20 million) is greater than the value of all asserted liens against the Sweetpea stock (estimated by Trustee at approximately $ 1 million). Therefore, Section 363(f)(3) is satisfied. As the Court has previously found, Trustee's proposed sale to TS Capital does not entail any transfer of the Beetaloo Assets themselves; these shall remain with Sweetpea. Accordingly, the sale to TS Capital is subject to the JVOA and all litigation of Sweetpea's position as against Paltar, including any joint venture cross charge issues raised by Objectors at trial.

In addition, the asserted liens against the Sweetpea stock are in bona fide dispute in the adversary proceeding *Jeffrey L. Hill, Chapter 7 Trustee v. JTE Finanz AG, et al.*, Adv. Proc. No. 17-1337. The Court need only find "there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest. This standard does not require that the Court resolve the underlying dispute or determine the probable outcome of the dispute, but merely whether one exists." *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996), citing *In re Collins,* 180 B.R. 447, 452 (Bkrtcy.E.D.Va.1995) and *In re Octagon Roofing,* 123 B.R. 583, 590 (Bkrtcy. N.D. Ill.1991).

### D. Waiver of the 14-day Stay Under Rule 6004(h)

Rule 6004(h) provides an order authorizing the sale of property is stayed "until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed.R.Bankr.P. 6004(h).

Although Rule 6004(h) does not on its face require this Court to find cause to waive the 14-day, the Court finds good cause exists to do so, in light of the time constraints in the Permits and TS Capital's prior extension of the closing date through April 26, 2019 to accommodate the scheduling of trial in this matter. To the extent Objectors complained Trustee's request for a waiver of the stay was not made clear in the Sale Motion, Trustee indicated in a separate provision requesting closing within five days of entry of the sale order, and the Court finds Rule 6004-1(d)(N) is satisfied. Sale Motion at ¶ 8(f).

For the reasons discussed above, it is hereby

ORDERED the Objection is OVERRULED, and Trustee's Sale Motion is GRANTED.

IT IS FURTHER ORDERED Trustee is AUTHORIZED to sell 100% of the issued and outstanding shares of capital stock of Sweetpea Petroleum Pty Ltd. stock to TS Capital Partners, LLC free and clear of all liens, claims, encumbrances and interests, pursuant to 11 U.S.C. §§ 363(b) and (f), Fed.R.Bankr.P. 6004, and the terms of the Purchase and Sale Agreement attached to the Sale Motion, except for the bid protections set forth in Section 11.02(b)(i) ), and with all valid liens to attach to the sale proceeds.

IT IS FURTHER ORDERED that the stay provided for in Bankruptcy Rule 6004(h) is hereby WAIVED, and this Order shall be effective immediately upon its entry.

Dated April 25, 2019.　　　　　　　　　BY THE COURT:

_Kimberley H. Tyson_
Kimberley H. Tyson
United States Bankruptcy Judge